## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

POCONO MEDICAL CENTER d/b/a     :
LEHIGH VALLEY HOSPITAL - POCONO, :
                            :
         **Plaintiff,**           :
    **v.**                    :     **3:22-CV-1901**
                            :     **(JUDGE MARIANI)**
**JNESO DISTRICT COUNCIL 1,**      :
**INTERNATIONAL UNION OF**        :
**OPERATING ENGINEERS, AFL-CIO**   :
                            :
         **Defendant.**        :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

This case presents a challenge to a labor arbitration award issued pursuant to the grievance-arbitration provisions of a collective bargaining agreement between Plaintiff Pocono Medical Center d/b/a Lehigh Valley Hospital – Pocono (hereinafter "LVHP") and Defendant JNECO District Council 1, International Union of Operating Engineers, AFL-CIO (hereinafter "JNESO" or "the Union"). Plaintiff LVHP commenced this action by filing a "Complaint and Motion to Vacate Arbitration Award" (Doc. 1). In turn, the Union has filed a "Petition" to confirm the arbitration award and to dismiss Plaintiff's Complaint (Doc. 4).

The procedural posture of this case requires further elucidation as the parties have invoked both Section 301 of the Labor Management Relations Act, ("LMRA"), 29 U.S.C. § 185, and Sections 9 and 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*

Preliminarily, though the Union has titled its request for confirmation of the arbitration award as a "Petition", under the FAA, the Court deems this filing to be a motion. *See PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308, 319 (3d Cir. 2021) (noting that in *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 307-308 (3d Cir. 2006), "[w]e concluded that IFC's application for confirmation of an arbitration award was a motion, not a pleading, notwithstanding the fact that it was labeled a 'petition.'"). Further, the Union's motion to confirm the arbitration award requests that the Court enter an order "confirming said arbitration award, directing that judgment be entered thereon and awarding such other relief as the court may deem equitable and just." (Doc. 4-2, at 6). As the Third Circuit in *PG Publishing, supra,* observed, "[w]e have held that applications to confirm an arbitration award under FAA Section 9 are to be made as motions." 19 F.4th at 312 (citing *IFC Interconsult, AG,* 438 F.3d at 308). The Court in *PG Publishing* added that "[w]e hold here that applications to vacate an arbitration award under FAA Section 10 are also to be made as motions." *Id*.

Here, LVHP filed a Complaint and Motion to Vacate Arbitration Award (Doc. 1) and asserts that this Court has jurisdiction pursuant to Section 301 of the LMRA, 29 U.S.C. § 185, and also pursuant to the FAA, 9 U.S.C. § 10. (Doc. 1, ¶ 4). The Complaint and Motion to Vacate Arbitration Award filed by LVHP was filed on November 30, 2022 while the motion of the Union to confirm the arbitration award was filed on December 30, 2022.

The Third Circuit, in *PG Publishing,* noted that there is "a formal difference between the standards applicable to an LMRA Section 301 complaint and an FAA Section 10 motion, even if both are brought simultaneously by a single party to seek vacatur of the same arbitration award based on all of the same arguments."  19 F.4th at 314.  However, the Court added that "in practice, that formal distinction may often be of little significance.  It may well be the case that many LMRA Section 301 actions to vacate can be decided as a matter of law on the pleadings."  *Id*.

In this case, before the Court is LVHP's "Complaint and Motion to Vacate Arbitration Award" (Doc. 1), the Union's "Notice of Motion to Confirm Arbitration Award and to Dismiss Complaint" (Doc. 4), the Union's "Petition to Confirm Arbitration Award" (Doc. 4-2) and "Memorandum of Law in Support of Motion to Confirm Arbitration Award and to Dismiss Complaint" (Doc. 4-3), LVHP's "Brief in Opposition to Defendant's Motion to Confirm Arbitration Award and to Dismiss Complaint" (Doc. 10) and the Union's "Reply to Plaintiff's Opposition to Defendant's Motion to Confirm Arbitration Award and Dismiss Complaint" (Doc. 11).

Both LVHP and the Union have included in their briefs their respective positions as to whether LVHP's "Complaint and Motion to Vacate Arbitration Award" should be dismissed.  The Union's brief cites well-established case law for the proposition that "an arbitrator's award must be enforced so long as it draws its essence from the collective bargaining agreement."  (Doc. 4-3, at 17, 18, 19, 20, 24) (collecting cases and citing, among

other cases, *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960); *Ludwig Honold Mfg., Co. v. Fletcher*, 405 F.2d 1123 (3d Cir. 1969); and *United Paperworkers v. Misco, Inc.*, 484 U.S. 29 (1987)).  Plaintiff LVHP, in its brief in opposition to the Union's Motion to Confirm the Arbitration Award and to Dismiss the Plaintiff's Complaint, applies Federal Rule of Civil Procedure 12(b)(6) and asserts that "JNESO's Motion to Dismiss the Complaint must be denied as LVHP has stated a claim upon which relief can be granted." (Doc 10, at 11).  In support of its opposition to the Union's Motion, LVHP likewise asserts that the essence test as developed by the courts granting limited review of labor arbitration awards under Section 301 and the FAA applies in this case and asserts further that the arbitration award should be vacated because it does not draw its essence from the collective bargaining agreement.  (Doc. 10 at 15-16, 23-27).  Indeed, the brief of LVHP presents an assault on the arbitration award based entirely upon the case law applying the essence test to determine the validity of the arbitrator's award.

This preliminary recitation of the parties' pleadings became necessary, in this Court's view, because while both the Union and LVHP have submitted briefs arguing their respective positions as to whether LVHP's Complaint and Motion to Vacate Arbitration Award should be dismissed under Federal Rule of Civil Procedure 12(b)(6), it was unclear to the Court whether the Union's Motion to Confirm the Arbitration Award (Doc. 4-2) was intended as a motion to dismiss under Rule 12(b)(6) and whether Defendant, LVHP, recognized it as such.  This concern was resolved in large part by this Court's review of the

4

parties' briefs which, as stated previously herein, made clear that the parties understood and agreed that the Union's motion to confirm also served as a motion to dismiss LVHP's "Complaint and Motion to Vacate Arbitration Award". To ensure the absence of any procedural misunderstanding between the parties as to the posture of this case as it now stands before the Court, the Court held a conference call with counsel for the parties on July 11, 2023, the transcript of which is filed of record. (Doc. 19).

> In that telephone conference, the Court stated:

> Now, under the case law, including *Teamster's Local 177 v. UPS*, which is 966 F.3d, 345, that case law makes clear that a Motion to Confirm can't be granted where there is a Complaint to Vacate pending. That is to say, the Complaint to Vacate has to be addressed, because I can only confirm an award where it has not been vacated, modified or corrected.

> So the basic question that I have for you is, what do each of you regard the union's Motion to Confirm as? And more specifically, do you regard it as a Motion to Dismiss the hospital's Complaint to Vacate that was brought under Section 301 of the Labor Management Relations Act?

(Doc. 19, 2:17-25; 3:1-2). The Court continued:

> **Court**: So the argument in the hospital's brief seems to accept the union's motion, and I know it's called a petition, but the case law regards it as a motion, that's under *PPG International*, another case that I'll give you the cite for if you don't have it, I think you do, but the basic issue here is do you, Steve [Hoffman], on behalf of the hospital, regard that Motion to Confirm and the brief that was filed with it as a Brief in Support of a Motion to Dismiss your Complaint to Vacate? That the way it looks to me.

> **Mr. Hoffman**: That's the way we took their filing as a Motion to – that we filed under the Labor Management Relations Act, which means we proceeded under the Rules of Civil Procedure, as opposed to the Federal Arbitration Act. So we took it and they styled it as sort of both, but we took it as a Motion to Dismiss

5

under 12(b)(6), and that the Petition to Confirm or Motion to Confirm is premature so we get through all this.

(*Id*. at 3:25; 4:1-7).  Defendant's counsel then stated that the Union's motion "was both a

Motion to Confirm the arbitration award and dismiss the complaint" (*id.* at 4:19-20) and

engaged in the following exchange with the Court:

> **Mr. Heineman**:  Yes, Your Honor. I know I had filed a petition, but that's an FAA document.
>
> **Court**:  It is.
>
> **Mr. Heineman**:  But the actual Motion to Dismiss and the brief were both on noting the – notice of motion, it's a notice of Motion to Confirm Arbitration Award and Dismiss Complaint, and the brief is styled the same way.

(*Id*. at 5:3-9).

The telephone conference concluded with counsel for the parties agreeing that the

Union had filed a motion both to confirm the award and also a motion to dismiss the

complaint to vacate.

> **Court**:  . . .  I'm okay with knowing what comes next, as long as I know what I have before me to decide, and that, of course, is why I called the two of you to make sure that you both took your filing, Ray Heineman, as not only a Section 9 FAA Motion to Confirm the award, but also a Motion to Dismiss the Complaint to Vacate.
>
> **Mr. Heineman**:  Correct.
>
> **Mr. Hoffman**:  Yes.
>
> **Mr. Heineman**:  Yes, Your Honor, I agree with that.

(*Id*. at 10:1-9).

The Court thus ended the conference by stating that it would not require the filing of any additional motion "because you both have made it clear to me that what you did file, Ray Heineman, is intended by you and accepted by Steve Hoffman as a Motion to Dismiss the Section 301 complaint filed by the hospital, and I can go forward now." (*Id*. at 10:10-15).

Accordingly, before the Court is the Union's Motion to Dismiss LVHP's "Complaint and Motion to Vacate Arbitration Award" which sustained the Union's grievance. The Union's request for confirmation of the arbitration award must be deferred pending the disposition of its Motion to Dismiss. *See Teamsters Local 177 v. United Parcel Service*, 966 F.3d. 245, 252 (3d Cir. 2020) ("The FAA explicitly requires that arbitration awards be confirmed. What could be stronger than language that, upon application, a district court 'must grant [a confirmation] order' unless the arbitration award is 'vacated, modified, or corrected.' § 9."). *See also PG Publishing, Inc*. 19 F.4th at 313 ("[C]onfirmation and vacatur of an arbitration award are simply opposite sides of the same FAA coin: 'A court must confirm an arbitration award unless it is vacated, modified or corrected.'")(quoting *Hall St. Assocs., LLC v. Mattel, Inc*., 552 U.S. 576, 582 (2008)).

This Court thus turns to the "Complaint and Motion to Vacate Arbitration Award" of Plaintiff LVHP and the Motion to Dismiss that Complaint by the Union. For the reasons that follow, the Union's motion to dismiss will be granted.

## II. FACTUAL ALLEGATIONS

The Plaintiff Hospital's Complaint alleges that JNESO District Council 1, International Union of Operating Engineers "is the bargaining representative for all full-time, and regular part-time and per diem nurses, non-supervisory registered nurses, cardiac rehab nurses, interventional radiology nurses, cancer nurses, and weekend program nurses employed at LVHP at its East Stroudsburg, Monroe County location." (Doc. 1, ¶ 8). The Hospital further alleges that it and the Union entered into a Collective Bargaining Agreement ("CBA") on or about February 1, 2021 "which covers the period of February 1, 2021 through January 31, 2024." (*Id*. at ¶ 9). The Plaintiff attached to its Complaint a copy of that CBA marked as Exhibit A and incorporated that document by reference. (*Id*.).

The Complaint alleges that the Union filed a grievance denominated number 22-LM-02 on January 17, 2022 wherein it alleged that "PCU nurses, T. Miller, Robin Miller, Stacy Cullin, where [sic] given: new Revised Positions – not hired for on Friday 1/14/22 additional RNs on 1/17/22." (*Id*. at ¶¶ 10, 11). The grievance also asserted a violation of Article 8.0 of the CBA entitled "Hours of Work." (*Id*. at ¶ 12).

The grievance was denied by LVHP on February 22, 2022 and the Union then filed a request for arbitration which resulted in a hearing held on its grievance before Arbitrator Louis Verrone on August 17, 2022. (*Id*. at ¶¶ 13, 14).

LVHP's Complaint sets forth the text of Article 8.4 of the CBA as follows:

PMC has the right, after giving JNESO two (2) weeks advance notice in order to discuss the change, followed by four (4) weeks' notice to affected

8

employees, to change the current starting time or current shift hours of employees. However, if the changed starting time or shift hours cause hardship to particular employee, such employees should[1] be permitted to displace employees with less bargaining unit seniority from positions which have retained the employee's starting time or shift hours, subject to the limitations contained in Article 7, Seniority, Section 7.5, Layoffs.

(*Id.* at ¶ 16).

The Plaintiff's Complaint sets forth other sections of the collective bargaining agreement, notably Article 8.8(b) and the management rights provision of Article 3.2 (*id.* at ¶¶ 17, 18), and asserts that LVHP informed the Union that "LVHP intended to invoke Article 8.4 of the CBA to change the starting time and shift hours of employees" (*id.* at ¶ 19).

LVHP alleges "that the CBA does not require LVHP to maintain specific starting times or shift hours." (Doc. 1, ¶ 31). It further asserts that on January 17, 2022, approximately six weeks after LVHP provided notice to JNESO that it intended to invoke Article 8.4 of the CBA, JNESO filed its grievance alleging a violation of Article 8, Hours of Work. (*Id.* at ¶ 32). LVNHP contends that the Union's grievance was untimely filed when it was filed on January 17, 2022. (*Id.* at ¶ 35).

---

[1] LVHP, in quoting the text of Article 8.4, incorrectly states the text of the second sentence. Specifically, a review of the CBA, attached as Exhibit A, to LVHP's Complaint provides: "However, if the changed starting time or shift hours cause hardship to particular *employees,* such employees *shall* be permitted to displace employees with less Bargaining Unit seniority from positions which have retained the employee's starting time or shift hours, subject to the limitations contained in Article 7, Seniority, Section 7.5, Layoffs." Plaintiff LVHP's quote of "should" is incorrect and instead is "shall" in the CBA. Likewise, the reference to the singular, i.e. employee, after the word "particular" should be plural, "employees."

The Complaint further states that "Arbitrator Verrone issued his Opinion and Award on November 3, 2022." (Doc. 1, ¶ 37). The Plaintiff Hospital attached a copy of the Opinion and Award as Exhibit B to its Complaint and incorporated it by reference. (*Id*.).

The Award of Arbitrator Verrone, dated November 3, 2022, provides:

1. The Union's grievance is sustained.
2. Consistent with this Opinion, the Hospital shall take the affirmative remedial steps outlined in the Remedy portion of this Opinion and Award.
3. The undersigned shall retain jurisdiction over all remedial aspects of this Award indefinitely as described in the Remedy portion of this Opinion and Award.

(Doc. 1-2, at 31).

LVHP's Complaint contains three counts: Count I entitled "Violation of LMRA Motion to Vacate Arbitration Award – Timeliness"; Count II entitled "Violation of LMRA Motion to Vacate Arbitration Award – Decision on the Merits"; and Count III entitled "Violation of LMRA Motion to Vacate Arbitration Award – Improper Remedy." (*See* Doc. 1, at 10-14).

### III. THE ARBITRATION AWARD

The Arbitration Award is attached to LVHP's Complaint as Exhibit B (Doc. 1-2) and the parties' CBA is attached as Exhibit A (Doc. 1-1). In ruling on a Motion to Dismiss, it is well-settled that a Court, in certain circumstances such as those presented in this case, is permitted to consider documents attached to the Plaintiff's Complaint. *See In re. Burlington Coat Factory Secs. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the

pleadings.  However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment") (emphasis in original) (internal citations and quotations omitted); *see also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F. 2d 1192, 1196 (3d Cir 1993).  Thus, this Court will review the Arbitrator's Award in accordance with the standard of review set forth in Section IV, *infra*, of this Memorandum Opinion.

The Arbitration Award indicates that the parties stipulated to the following issues before the Arbitrator:

> Whether the Employer, Lehigh Valley Hospital – Pocono, violated Article 8, Hours of Work, of its Collective Bargaining Agreement with the union, JNESO, by changing day shift registered nurses to day shift with flex?
>
> If so, what shall be the remedy?

(Doc. 1-2, at 1).  Additionally, the Arbitrator noted the following issue before it as added by the Company:

> Whether the Union's Grievance in this matter was timely filed under the terms of Article 17, Grievance Procedure, of the parties' Collective Bargaining Agreement?

(*Id.*).

The Award includes a list of the joint exhibits submitted by the parties as well as the Employer's exhibits and the Union's exhibits submitted at the hearing. (*Id.* at 2).  The Arbitrator's Opinion notes that at the hearing held on August 17, 2022, "both parties were

present and duly represented by Counsel throughout the proceedings.  Each was afforded

full and complete opportunity to make opening statements, to present and offer relevant

evidence, to examine and cross-examine witnesses and to argue in support of their

respective positions and contentions." (*Id*. at 3).  At the conclusion of the hearing, the

parties were allowed to file post-hearing briefs after which the record was closed.  Arbitrator

Verrone also quoted Section 18.4 of the CBA, stating that the Arbitrator "shall have no

power to add to, subtract from, or modify in any way, any of the terms of this Agreement or

to issue an award inconsistent with any applicable law." (*Id*.).

The Arbitrator then set forth the "primary" issue before him:

> Succinctly stated the primary issue herein is whether under Article 8, Hours of Work, at Section 8.4 of the parties' Agreement, the Employer has the right to change the "current starting times" or "current shift hours" of its employees. Also, to be considered is whether the Union's grievance contesting the Employer's announcement of a change in hours or shifts was timely filed.

(*Id*. at 4).

The Arbitrator found as "undisputed" that the Union's grievance, 22-LM-02, entered

as joint exhibit 2, reads as follows:

> "PCU nurses, T. Miller, Robin Miller, Stacy Cullin where [sic] given new Revised Positions – not hired for on Friday 1/14/22 additional RNs on 1/17/21" [sic]. Article 8.0 of work & any and all other applicable provisions and laws."

(Doc. 1-2, at 5-6).  The Arbitrator further found as "undisputed" that "by correspondence

dated February 22, 2022, [Lynn] Lansdown [Vice President of Labor Relations and Human

Resources] denied the Union's grievance by way of a lengthy defense that, *inter alia*, 'on

12

November 30, 2021, . . . the Hospital informed the Union that per Article 8.4 Hours of Work,

RNs working in the day shift in 24/7 operational departments would have their shift changed

to day shift with a flex option to evening/night shift as needed.'"  (*Id*. at 6).

The Arbitrator thereafter summarized the testimony of the parties' witnesses, cited

the relevant contract provisions, i.e., Article 8 – Hours of Work and Article 3 – Management

Rights, and summarized the parties' respective positions.  (*Id*. at 14-18).

In the section of the Award entitled "Discussion and Opinion", Arbitrator Verrone first

addressed the contention of LVHP that the Union's grievance was untimely.  The Arbitrator

found:

> Despite the parties' varying interpretations of Article 8.4, the undisputable
> evidentiary record established that employees are offered and accept
> "positions" which provide for the shift hired and whether the position requires
> "flex" to another shift or not.  For example, pursuant to the Union's request for
> information (RFI) dated January 27, 2022, letters confirming employment or
> written documentation of a voluntary change of position specify the shift the
> nurse has accepted and whether the assignment is with flex to another shift or
> shifts.

(*Id*. at 20) (internal citations omitted).  The Arbitrator also quoted from the Hospital's

January 17, 2022 notification to an affected registered nurse which sets forth as to that

individual the notice that her "position" of "Day shift" was being changed to "Day shift with

flex to evening/night shift as needed."  (*Id*.).

The Arbitrator noted the Union's argument that the Hospital "was not changing the

hours of shifts or the starting time of its nurses as the Union interprets Article 8.4 or even

the Hospital's right to assign nurses to other shifts, as needed, as it contends but was rather

13

changing the '**position**', (*emphasis supplied*), that each individual nurse was hired for, bid

on or was promoted to . . . " (*Id*. at 21) (emphases in original).  The Arbitrator found that it

was "no coincidence" that LVHP's responses to the Union's initial request for information

was provided on January 17, "the same date that employees received or were to receive

their revised position letters rather than on or before December 9 as the Union had

requested." (*Id*.).  Accordingly, the Arbitrator concluded:

> Thus, not until January 17 was the Union notified which specific units were to
> be flexed and the number of nurses involved, which I find, under the totality of
> circumstances presented herein, establishes the operative date of knowledge
> of a prospective contractual breach.

(*Id.*).  On this basis, the Arbitrator found the Union's grievance timely:

> Accordingly, I find that the Hospital's delay in providing the Union with the
> information requested in a more timely fashion is the primary factor in
> concluding that the Union's grievance must be considered timely filed.  Other
> factors considered in reaching this determination include the fact that, not only
> did the Hospital continue to engage the Union in the processing of the
> grievance by responding to subsequent requests for information but that the
> record reflects, as Ms. Lansdown testified, that as of the date of this arbitration,
> August 17, 2022, no employees had actually been flexed due to bonus
> incentives that had been offered.

(*Id*. at 22-23).  The Arbitrator further found that "with the exception of cardiac rehab, the

record reflects that at no time during the length of Lansdown's employment, 2007 through

January 17, 2022, some 15 years, had employees been changed from day shift to day shift

with flex to another shift against their will." (*Id*. at 23).  The Arbitrator also concluded that "it

does not appear that any nurses were actually flexed as of the date of the arbitration, some

8 or 9 months since its November 30, 2021 announcement" and expressed his view that

14

"the Hospital would be unable to demonstrate how it would be in any way prejudiced by the continued processing of the Union's grievance through arbitration." (*Id*.).

The Arbitrator further found that "the matter of the continuing violations doctrine becomes increasing[ly] more clear as any potential change to flex status involves reoccurring acts raising discrete grievances for each of the affected employees." (*Id*. at 23-24).  This conclusion was preceded by the Arbitrator's finding that "[w]hile the Union may have been on Notice as of January 17, 2022, of the Hospital's intent to make changes within any of these units as a whole, each of these 116 nurses involved may have a wide variety of job related considerations incidental to their individual employment including matters of 'hardship' and the application of Article 7 Seniority and Layoff rights as specifically provided for under Article 8.4." (*Id*. at 23).

The Arbitrator then addressed the merits of the Union's grievance, noting that it "rest[ed] on the meaning of Article 8.4 of the Agreement." (Doc. 1-2, at 24).  After considering the respective arguments of the Union and LVHP as to the meaning of Article 8.4, Arbitrator Verrone wrote:

> Considering the foregoing, I am of the opinion that the evidence thus far adduced, establishes that the disputed language is susceptible to more than one plausible interpretation rather than a single clear and unambiguous conclusion and is, therefore, debatable.  The question, therefore, presented is how the disputed ambiguous language shall be resolved.

(*Id*. at 24).

The Arbitrator then discussed the evidence presented stating:

> As the record reflects that the disputed language has existed in the current Agreement and in predecessor agreements for many years, the only evidence of any change to its terms occurred during the most recent negotiations where it is undisputed that the notification periods had been shortened. Notwithstanding, no testimony was elicited to what extent there may have been any discussion as to its substantive meaning or application, if any, during negotiations. As such, I am left to conclude that neither party intended any change to their perceived understandings of its meaning or application. Likewise, the absence of evidence of any prior settlements between the parties as to Article 8.4, fails to assist the arbiter in resolving its meaning.

(*Id.* at 24-25).

Having found the language of Article 8.4 to be "susceptible to more than one plausible interpretation" and therefore ambiguous, the Arbitrator resorted to the use of the parties' custom or past practice:

> One of the most important standards used by arbitrators in the interpretation of ambiguous language is that of the relevant custom or past practice of the parties. As such, and mindful of the Employer's admonishment against the use of parole evidence in which extrinsic evidence is offered "to contradict a final and complete written expression . . . the parole evidence rule does not exclude extrinsic evidence offered to interpret the terms of an agreement, at least when the language is 'ambiguous.'"

(*Id.* at 25) (some internal quotation marks omitted). The Arbitrator then considered the evidence presented to him, stating:

> Here evidence entered into evidence sufficiently established that the former employment offers and acceptances and/or transfers to new positions specify the nurse's "position" and "shift" or "shift with flex" to another shift. Indeed, the Hospital's January 17, 2022 letters to nurses advising them of these new shift assignments with flex specifically also refers to their "Revised Position."

(*Id.* at 25-26).

Arbitrator Verrone observed that the revised positions were not temporary and clarified that "the Union takes no exception to the hiring of nurses to positions which provide for shifts with flex, but rather to what it describes as the 'Hospital's attempt to circumvent longstanding protections afforded nurses . . . whether to work days or night shifts' or both." (*Id*. at 26).

The Arbitrator found that a "longstanding and undisturbed practice" existed with respect to nurses' hours of work "over the past 25 to 30 years." He identified that practice as follows:

> Based upon the foregoing, it appears that the longstanding and undisturbed practice of the parties with respect to nurses' hours of work over the past 25 to 30 years was that nurses were assigned to specified shifts with or without flex to another shift and that any changes made were as a result of a nurse's willingness to accept another position which may or may not have had a different shift requirement.

(*Id*. at 26). The Arbitrator found this practice to be consistent with the CBA's Management Rights clause which accords to the Hospital in Article 3 the right, *inter alia*, "to determine or change the starting and quitting time and number of hours to be worked" as well as to "determine the number of shifts." (*Id*.).

The Arbitrator reasoned that when the quoted language of the Management Rights clause is read in conjunction with Article 8.4, "it permits the Hospital to broadly determine the starting and quitting time of its employees within the scope of number of shifts deemed necessary, including the length of each shift." (Doc. 1-2, at 26). He found this right to be "reinforced" by Article 8.4 which he interpreted as permitting "changes to be made to the

17

current starting and quitting times and shift hours of employees abridged only by the

advanced notification requirements referenced." (*Id.*). While the Arbitrator found that under

Article 8.4 of the CBA, the current starting times of the Hospital's shift nurses could be

changed to a different day shift starting time or the length of a day shift itself could be

changed,

> [Article 8.4] does not however, permit the Hospital to change the "current
> position" of an employee which specifies the applicable shift or shifts
> associated with that position. It cannot be stressed enough that the Hospital
> attempts not to change the starting and ending time of certain shifts or the hours
> of its several shifts but rather to expand the "position" of its employees to be
> available to work multiple shifts rather than those shifts under which
> employment was offered and accepted. Moreover, the work schedules of those
> employees which have consisted of single shift positions has been engrained
> in the parties' scheduling practices for at least the past 25 years and, as such,
> may be considered a benefit of personal value to employees. In similar
> circumstances, arbitrators have found a custom or past practice to be binding
> where it involves a benefit of personal value to employees, including "work
> schedules."

(*Id.* at 27). On this basis, the Arbitrator found a violation of the CBA, stating:

> Therefore, based upon all of the foregoing including the documentary and
> testimonial evidence adduced during the hearing including certain credibility
> inferences drawn therefrom, and after careful consideration of the entirety of
> the transcript and the post-hearing briefs of the parties, my judgment leads me
> to conclude that the preponderance material evidence supports a finding that it
> is more likely than not that the Hospital misapplied the application of Article 8.4
> by revising employees' positions to include a "flex" shift requirement to another
> shift(s) where no such requirement was previously required in violation of the
> Agreement.

(*Id.*).

The Arbitrator then turned to the issue of the appropriate remedy.  The Union sought a remedy for LVHP's contract violation which the Arbitrator described as a request that he "issue a cease and desist order and that those nurses who had claimed hardships which prevented them from working night shifts for a month at a time and who, therefore, resigned their positions be offered reinstatement to their former positions and be made whole for any lost wages and benefits they may have suffered as a result." (Doc.1-2, at 28).  The Union further requested that the Arbitrator retain jurisdiction "over the remedial aspects of the remedy imposed."  (*Id.*).

The Arbitrator, in issuing the remedy, first ordered that the "hospital's notification letters of January 17, 2021 and including any such similar letters which may have been subsequently issued, be rescinded forthwith in order to return those employees affected, or due to be affected, to the *status quo ante*."  (*Id.*).

With respect to the Union's request for an order of reinstatement for nurses who the Union contended resigned as a consequence of the change of their respective shift as a result of LVHP's contract violation, the Arbitrator noted that the grievance was filed as a "class action" grievance and as such, "it is inherently required that I consider the impact of the Hospital's reclassification of nurses' positions upon the entire 'class' as a whole."  (*Id.* at 29).  The Arbitrator found that the members of the class consisted of "all current and former nurses who were issued the letters dated January 17, 2022 adding a flex requirement to a different shift to their respective positions."  (*Id.*).  The Arbitrator then directed that "the

19

Hospital provide written notification to all nurses who, on January 17, 2021, were 'members

of the class'", with such notice to state:

> First, that the Hospital's letter of January 17, 2021 (JX-5) has been rescinded
> and, second, that all members of the class, who may have resigned their
> positions of employment due to, in substantial part, the pending imposition of a
> February 20, 2022 implementation date are entitled to reinstatement to their
> former positions of employment without loss to seniority or benefits.  Thus, it is
> further ordered that the recission letters be mailed, by certified mail, to the last
> known addresses of those employees who have resigned within thirty (30) days
> from the date of the issuance of this Opinion and Award.  Current employees
> who received the letter of January 17, may be provided rescission letters by
> either regular mail or in person at their place of employment within thirty (30)
> days of this Opinion and Award.  Additionally, rescission letters sent to those
> employees who resigned shall provide that in order to be considered for
> reinstatement, the individual must respond to the Hospital in writing, with a copy
> to the Union, not later than thirty (30) days from their receipt of the rescission
> letter.  I shall leave to the parties the details of the eligibility and/or integration
> of any nurse deemed eligible for reinstatement to their former position of
> employment using traditional reinstatement criteria.  Lastly, absent exceptional
> circumstances not presented during the course of the arbitration, the
> reinstatement of any eligible nurse shall be without backpay as the record
> reflects that as of the date of the hearing, all changed shift assignments were
> made through the use of volunteers and incentives.  I, therefore, find that
> resorting to resignation was somewhat premature and, as the record also
> reflects, alternate equivalent employment opportunities were generally
> available.  As I have retained jurisdiction indefinitely over all remedial aspects
> of this Opinion and Award, any further dispute between the parties as to the
> application of the remedial provisions ordered herein, including issues as to
> eligibility for reinstatement, may be presented to the undersigned for
> consideration.

(Doc. 1-2, at 29-30).

## IV. STANDARD OF REVIEW

This Court next considers the applicable standard of review of this labor arbitration award.

Ever since the Supreme Court issued its decisions in the "*Steelworkers Trilogy*,"[2] it has been an established principle of federal labor law that "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards," *Enterprise Wheel*, 363 U.S. at 596. "As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate." *Misco, Inc.*, 484 U.S. at 36 (citing *Enterprise Wheel*, 363 U.S. at 597). These principles have been reaffirmed repeatedly by the Supreme Court, notably in *Misco, Inc., supra*, and in *Eastern Associated Coal Corporation v. United Mine Workers of America*, 531 U.S. 57 (2000).

The Supreme Court's decision in *Misco* forcefully describes the limits on review of labor arbitration awards interpreting the provisions of a collective bargaining agreement:

> Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, and this is such a case, the Court made clear almost

---

[2] *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960); *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960).

30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. *Id.*, at 597, 80 S.Ct., at 1361.

> "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

> "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 567-568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) (emphasis added; footnote omitted).

See also *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649-650, 106 S.Ct. 1415, 1418-1419, 89 L.Ed.2d 648 (1986).

*Misco, Inc.*, 484 U.S. at 36-37.

The Supreme Court in *Misco* further emphasized that:

Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an

arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. *Enterprise Wheel, supra*, 363 U.S., at 599, 80 S.Ct. at, 1362. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined. Furthermore, it must be remembered that grievance and arbitration procedures are part and parcel of the ongoing process of collective bargaining. It is through these processes that the supplementary rules of the plant are established. As the Court has said, the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice.

*Id.* at 38.

Finally, the deference accorded to the decision of a labor arbitrator is summarized as

follows:

But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

*Id.*

These principles as quoted in *Misco* were expressly reaffirmed by the Supreme Court

in *Major League Baseball Players Association v. Garvey*:

Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). We recently reiterated that if an

> "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (quoting *Misco, supra*, at 38, 108 S.Ct. 364). It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision may be unenforceable. *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, factfinding" does not provide a basis for a reviewing court to refuse to enforce the award. *Misco*, 484 U.S., at 39, 108 S.Ct. 364.

532 U.S. 504, 509 (2001).

## V. ANALYSIS

Plaintiff LVHP, in support of its Complaint and Motion to Vacate the Verrone Arbitration Award in favor of the Union, sets forth in its Brief in opposition to the Union's motion to dismiss the Complaint and confirm the award (Doc. 10) a series of arguments to support its claim that the award should be vacated. Each of these will be addressed herein.

First, LVHP asserts that it "has plausibly pled facts to support that the Arbitration Award should be vacated based on the Arbitrator exceeding his jurisdiction as the union's grievance was untimely." (Doc. 10, at 13). It argues that "it has been properly pled that JNESO did not file its grievance until January 17, 2022, more than 10 days after receiving notification of the alleged occurrence." (*Id.*).

Article 17 of the CBA, entitled "Grievance Procedure", provides at Step One:

> Within ten (10) working days of its occurrence (except as provided under the Discharge and Penalties Article of the Agreement), an employee having a grievance and/or her/his JNESO delegate shall take it up with her/his immediate Supervisor.  PMC need not accept a grievance filed after the above ten (10) day period. PMC shall give its answer in writing to the employee and/or her/his JNESO representative within five (5) working days after the presentation of the grievance in Step One.

(Doc. 1-1, at 54).

The Arbitrator found that the "occurrence" under Step One triggering the ten working days within which a grievance is to be filed was January 17, 2022, "the same date that employees received or were to receive their revised position letters rather than on or before December 9 as the Union had requested."  (Doc. 1-2, at 21).  Specifically, the Arbitrator found that "not until January 17 was the Union notified which specific units were to be flexed and the number of nurses involved, which I find, under the totality of circumstances presented herein, establishes the operative date of knowledge of a prospective contractual breach."  (*Id*.).  On this basis, the Arbitrator found the Union's grievance timely:

> Accordingly, I find that the Hospital's delay in providing the Union with the information requested in a more timely fashion is the primary factor in concluding that the Union's grievance must be considered timely filed.  Other factors considered in reaching this determination include the fact that, not only did the Hospital continue to engage the Union in the processing of the grievance by responding to subsequent requests for information but that the record reflects, as Ms. Lansdown testified, that as of the date of this arbitration, August 17, 2022, no employees had actually been flexed due to bonus incentives that had been offered.

(*Id*. at 22-23).

The Arbitrator's determination of the timeliness of the grievance is rationally derived from the language of Article 17 and the Arbitrator's factual determination as to when the "occurrence" giving rise to the Union's grievance took place.  As previously stated, the Supreme Court in *Misco* explained that Courts

> do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.

*Misco, Inc.*, 484 U.S. at 38.

Further, the timeliness of the Union's grievance presents, in the first instance, a question of procedural arbitrability.  In *John Wiley & Sons, Inc. v. Livingston*, the Supreme Court ruled that

> Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.

376 U.S. 543, 557 (1964).  LVHP, however, argues that the timeliness of the grievance presents a substantive rather than a procedural dispute.  (Doc. 10, at 16).  It further states that "[c]ourts make determinations of substantive arbitrability, while arbitrator's [*sic*] decide procedural matters."  (*Id.*).  Plaintiff asserts that the parties to a CBA can "contract for specific issues and disputes to remain outside the scope of an arbitrator's jurisdiction", and,

quoting a Third Circuit case, states that "the normally favored 'presumption of arbitrability' in section 301 labor relations cases, [may be] overcome by language in a collective bargaining agreement circumscribing the jurisdiction of a dispute resolution body." (Doc. 10, at 16-17) (quoting *Graphic Commc'ns Int'l Union, Local 735-S v. N. Am. Directory Corp.*, 98 F.3d 97, 98 (3d Cir. 1996)). LVHP contends that, here, the "grievance and arbitration clauses of the CBA are narrowly drafted and thus should be narrowly interpreted." (*Id.* at 17). On this basis, LVHP argues that "[t]he parties explicitly agreed to a narrow time limit to file a grievance" and that "[s]uch narrow time limits are substantive limits and not procedural." (*Id.* at 18).[3]

---

[3] In support of its argument, LVHP cites *Wyandot Inc. v. Local 227, UFCW*, 205 F.3d 922 (6th Cir. 2000). (Doc. 10, at 18). However, the decision in *Wyandot, Inc.* relied upon a standard of review of a labor arbitrator's award as set forth in *Dobbs, Inc. v. Local 614, Int'l Brotherhood of Teamsters*, 813 F.2d 85 (6th Cir. 1987), which in turn quoted and adopted the standard of review set forth in *National Gypsum Co. v. United Steelworkers of America*, 793 F.2d 759 (6th Cir. 1986). *See Wyandot Inc.*, 205 F.3d at 929. Plaintiff fails to note that in 2007, the Sixth Circuit, in *Michigan Family Resources, Inc. v. Service Employees International Union Local 517 M*, expressly overruled its decision in *National Gypsum*, stating:

> During the twenty years since *Cement Divisions [National Gypsum]*, the Supreme Court has refined the standard of review in this area in two cases, both of which suggest that *Cement Divisions* gives federal courts more latitude to review the merits of an arbitration award than the Supreme Court permits.

475 F.3d 746, 751 (6th Cir. 2007). The Court in *Michigan Family Resources* further explained:

> Our decision in *Cement Divisions* of course does not reflect these refinements of the *Steelworkers Trilogy* because the court had no reason to know they existed. Accordingly, instead of continuing to apply *Cement Divisions'* four-part inquiry, a test we now overrule, we will consider the questions of "procedural aberration" that *Misco* and *Garvey* identify.

*Id.* at 753. Since the decision in *Wyandot, Inc.* is founded upon *Cement Divisions*, *National Gypsum Co.*, its validity and use as precedent is questionable.

LVHP's argument cannot be reconciled with the Supreme Court's decision in *John Wiley & Sons*, *supra*, that "'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator," 376 U.S. at 557.  In any event, LVHP's argument fails even when reviewed under the correct standard for determining substantive arbitrability.

In *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 (1986), the Supreme Court addressed the issue of whether, in the first instance, the determination of whether the parties have agreed to submit a dispute to arbitration is for a court or the arbitrator to decide.  Citing to the *Steelworkers Trilogy*, *supra*. n.2, the Supreme Court held that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agree to arbitrate is to be decided by the court, not the arbitrator." 475 U.S. at 649.  The Court noted that, in deciding whether the parties have agreed to submit a particular dispute to arbitration, "a court is not to rule on the potential merits of the underlying claims." *Id*.  The Court thereafter reaffirmed the "positive assurance" test for determining whether an arbitration clause covers the parties' dispute.

> Finally, it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Warrior & Gulf*, 363 U.S., at 582-583, 80 S.Ct., at 1352-1353. *See also Gateway Coal Co. v. Mine Workers, supra*, 414 U.S., at 377-378, 94 S.Ct., at 636-637. Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any differences arising with respect to the interpretation of this

contract or the performance of any obligation hereunder...." In such cases, "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Warrior & Gulf, supra*, 363 U.S., at 584-585, 80 S.Ct., at 1353-1354.

*Id*. at 650.

The Third Circuit in *E.M. Diagnostic Systems, Inc. v. Local 169, International Brotherhood of Teamsters*, 812 F.2d 91 (3d Cir. 1987), in granting summary judgment to the Union in the employer's action brought to enjoin arbitration of the Union's grievance concerning the employer's use of outside contractors, held that the grievance came within the "zone of the Union's protected interests under the collective bargaining agreement" and was therefore arbitrable.  The Court followed the Supreme Court's decision in *AT&T Technologies, supra*, and the test set forth therein for determining whether the Union's grievance was arbitrable.  The Court quoted the afore-cited language of *AT&T* as follows:

> If the contract contains an arbitration clause, there is a presumption of arbitrability in that
>
>> "arbitration should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."
>
> *AT&T Technologies*, 106 S.Ct. at 1419 (quoting *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1352-53). Where, as in the instant case, the arbitration provision is a broad one,
>
>> "[i]n the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

*AT&T Technologies*, 106 S.Ct. at 1419 (quoting *Warrior & Gulf*, 363 U.S. at 584-85, 80 S.Ct. at 1353-54). A further settled principle of labor law is that,

> in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." *American Mfg. Co.*, 363 U.S., at 568, 80 S.Ct., at 1346 (footnote omitted).

*AT&T Technologies*, 106 S.Ct. at 1419.

812 F.2d at 95.

Using this test, the Third Circuit stated its analysis would be directed to three issues:

(1) Does the present dispute come within the scope of the arbitration clause? (2) does any other provision of the contract expressly exclude this kind of dispute from arbitration? and (3) is there any other "forceful evidence" indicating that the parties intended such an exclusion?

*Id*.

This approach to determining the arbitrability of a grievance has been consistently

followed.  For example, in *Service Employees International Union Healthcare v. Heritage*

*Valley Health System*, 842 F. App'x. 757 (3d Cir. 2021), the Third Circuit held that a dispute

between a hospital and a nurses' union as to whether the CBA required that a dispute over

staffing be submitted to arbitration was, in fact, arbitrable.  In so ruling, the Court restated

the test for determining the arbitrability of a dispute under a collective bargaining

agreement:

> "[A]rbitration is a matter of contract and a party cannot be required to submit to
> arbitration any dispute which he [or she] has not agreed so to submit." *United
> Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct.
> 1347, 4 L.Ed.2d 1409 (1960). But given the "strong federal policy in favor of
> resolving labor disputes through arbitration," *see Rite Aid of Pa., Inc.*, 595 F.3d
> at 131, doubts regarding whether an arbitration clause covers the dispute
> "should be resolved in favor of coverage," *United Steelworkers of Am.*, 363 U.S.
> at 582-83, 80 S.Ct. 1347.
>
> Where, as here, the collective bargaining agreement contains a broad
> arbitration clause, there is a presumption of arbitrability, and that presumption
> can be rebutted by "only the most forceful evidence of a purpose to exclude the
> claim from arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475
> U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Accordingly, to rebut
> the presumption, the opposing party must identify language in the agreement
> that expressly excludes the dispute from arbitration, or provide "strong and
> forceful" evidence of the parties' intent to not arbitrate the matter. *United
> Steelworkers of Am. v. Lukens Steel Co.*, 969 F.2d 1468, 1475 (3d Cir. 1992).
> But where the contract's language "is explicit and unambiguous regarding
> whether the [g]rievance is arbitrable[,] there is no need to look to extrinsic
> evidence." *Local 827, IBEW v. Verizon N.J., Inc.*, 458 F.3d 305, 312 (3d Cir.
> 2006) (quoting *Lukens Steel Co. v. United Steelworkers of America (AFL-CIO)*,
> 989 F.2d 668, 673 (3rd Cir. 1993)).

842 F. App'x. at 760.

Applying the test set forth in *E.M. Diagnostic Systems, supra*, the present dispute,

involving the application of Section 8.4 of the CBA, is clearly encompassed within the scope

the arbitration clause.

Section 17.1 of the CBA broadly defines a grievance as "a dispute [or] complaint . . .

arising between the parties hereto as to the application or interpretation of this Agreement . .

." (Doc. 1-1, at 53).  Article 18, entitled "Arbitration", provides in Section 18.1 that "[a]

grievance as defined in the Grievance Procedure Article which has not been resolved there-

under may, within ten (10) working days after completion of Step 3 of the grievance

procedure, be referred to arbitration only by JNESO by giving written notice to PMC and the

American Arbitration Association within the ten (10) working day period."  (*Id.* at 56).

Section 18.4 further confers jurisdiction on the arbitrator "only over disputes arising out of

grievances, as defined in Section 17.1 of the grievance procedure provision" and adds that

the arbitrator "shall have no power to add to, subtract from, or modify in any way, any of the

terms of this Agreement or to issue an award inconsistent with any applicable law."  (*Id.*).

Thus, the present dispute, arising as it does out of the application of Article 8, Section 8.4,

presents a dispute within the scope of the arbitration clause.  Further, no other provision of

the contract expressly excludes this kind of dispute from arbitration.  To the contrary, as

stated in Article 17, Section 17.1, a grievance is defined as a "dispute or complaint" as to

the application or interpretation of the CBA.  No provision of the Collective Bargaining

Agreement expressly excludes a grievance arising under Article 8, "Hours of Work", and

specifically, Section 8.4, from arbitration.  Nor does the Complaint and Motion to Vacate

Arbitration Award filed by LVHP allege any assertion of "forceful evidence" indicating that

the parties intended such an exclusion.  Instead, the Plaintiff's Complaint alleges that "[o]n

January 17, 2022, approximately 6 weeks after LVHP provided notice to JNESO that it

intended to invoke Article 8.4 of the CBA, JNESO filed its grievance that alleged a violation

of Article 8, Hours of Work." (Doc. 1, ¶ 32). While LVHP sets forth three counts in its

Complaint, the first asserting that the Arbitrator erred in finding the Union's grievance timely,

the second alleging that the Arbitrator's award did not draw its essence from the CBA and

was in manifest disregard thereof, and the third that the Arbitrator issued an improper

remedy and exceeded his powers in doing so, nowhere in LVHP's Complaint is there an

allegation that the parties intended to exclude this kind of dispute, arising from Article 8 or

Section 8.4 thereof, from arbitration, and LVHP does not so argue in its brief opposing the

Union's motion to dismiss.

Moreover, because the contract's language is explicit and unambiguous in providing

in Section 18.1 that a "grievance as defined in the Grievance Procedure Article which has

not been resolved there-under" may be submitted to arbitration, the Court need not consider

extrinsic evidence. *See Heritage Valley Health Sys.*, 842 F. App'x. at 760 ("But where the

contract's language is explicit and unambiguous regarding whether the grievance is

arbitrable, there is no need to look to extrinsic evidence.") (internal quotation marks and

brackets omitted).[4]

---

[4] This Court has found it necessary to engage in a recitation of the law regarding the determination of substantive  arbitrability even though the parties proceeded to arbitration and submitted all of their claims and defenses to arbitration without LVHP reserving its right to challenge, or otherwise challenging, the Arbitrator's jurisdiction to hear and decide the Union's grievance. While the Court notes that a challenge to a labor arbitrator's jurisdiction, i.e. whether the matter grieved is encompassed within the CBA's definition of a "grievance" which may be submitted to arbitration, is typically the subject of a complaint to enjoin arbitration, which is clearly not the case here, it nonetheless believes that its discussion of the law of substantive arbitrability herein serves to demonstrate further that the arbitration award at issue here draws its "essence" from the CBA.

Next, LVHP argues that "the arbitrator improperly found that Section 8.4 of the CBA was ambiguous" and that "such an interpretation constitutes a manifest disregard for the CBA and does not draw its essence from the CBA." (Doc. 10, at 14).

The arguments by LVHP, including its argument that "the CBA does not require LVHP to maintain specific starting times or shift hours", *id.*, reduce to a disagreement with the Arbitrator's interpretation of the CBA. As such, they are unavailing under the applicable standard of review. As the Supreme Court stated in *Misco*:

> To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.

484 U.S. at 38.

LVHP cites *Pennsylvania Power Company v. Local Union No. 72 IBEW*, 276 F.3d 174 (3d Cir. 2001) to support its argument. (*See* Doc. 10, at 14). However, in that case, the Circuit Court first noted that "the Company does not complain that the arbitrator erred in his interpretation of the Agreement" but instead that the arbitrator acted outside the scope of his "contractually delegated authority." *Penn. Power Co.*, 276 F.3d at 179. The Court agreed with the Company and vacated the award because the arbitrator "wrote into the contract that the Plant production and maintenance employees shall have the same benefits as the

supervisory employees", where the CBA specifically excluded supervisory employees from

its terms. *Id.*

*Pennsylvania Power Company* is distinguishable. Here, the parties expressly

stipulated to the issues before the arbitrator as:

> Whether the Employer, Lehigh Valley Hospital – Pocono, violated Article 8,
> Hours of Work, of its Collective Bargaining Agreement with the union, JNESO,
> by changing day shift registered nurses to day shift with flex?
>
> If so, what shall be the remedy?

(Doc. 1-2, at 1).  Those are the precise issues which the Arbitrator addressed and, in doing

so, applied the provisions of the CBA and specifically Section 8.4 thereof.  Then, having

found the language of Article 8.4 to be susceptible "to more than one plausible

interpretation", the Arbitrator properly resorted to the use of the parties' custom or past

practice.  As noted previously herein, Arbitrator Verrone found that a "longstanding and

undisturbed practice" existed with respect to nurses' hours of work "over the past 25 to 30

years."  He identified that practice as follows:

> Based upon the foregoing, it appears that the longstanding and undisturbed
> practice of the parties with respect to nurses' hours of work over the past 25 to
> 30 years was that nurses were assigned to specified shifts with or without flex
> to another shift and that any changes made were as a result of a nurse's
> willingness to accept another position which may or may not have had a
> different shift requirement.

(*Id.* at 26).  In no sense may it be said that the Arbitrator "exceeded his powers"; instead, he

confined himself to the interpretation of the CBA as evidenced by its language and the

parties' established practice thereunder.

LVHP next contends that the Arbitrator's Award does not draw its essence from the CBA "when he granted relief to employees who voluntarily resigned their employment with LVHP." (Doc. 10, at 14-15). LVHP asserts that "the CBA does not give the Arbitrator any power over an employer's hiring decisions" and further argues that the Arbitrator's retention of jurisdiction violates public policy and the doctrine of *functus officio*. (*Id*. at 15).

In making these and other arguments throughout its brief, LVHP repeatedly argues that this Court cannot make the necessary determination of whether the Arbitration Award draws its essence from the CBA "without a review of the full record that was before the Arbitrator including the arbitration transcript and the exhibits relied on by the parties." (*See id.* at 19).[5] Because the CBA and the Arbitration Award are attached to Plaintiff's Complaint

---

[5] LVHP makes the same argument in footnote 4 of its Opposition brief with respect to the Union's motion to confirm the arbitration award, stating that "there is not currently a full record for this Honorable Court to consider the merits of JNESO's Motion to Confirm the Arbitration Award . . ." (Doc. 10, at 15 n.4). It argues that "[t]o the extent this Honorable Court would consider JNESO's Motion at this stage, it would be converting the motion to dismiss into a motion for summary judgment which requires that the parties be given a reasonable opportunity to present all material relevant to a summary judgment motion." (*Id.*). In accordance with the agreement of the parties, the Union's Motion to Dismiss LVHP's Complaint and Motion to Vacate Arbitration Award is before this Court while the Union's Motion to Confirm must await the Court's determination of the motion to dismiss. This is so because, as the Court stated at a conference with counsel held on July 11, 2023 (*see* Doc. 19), pursuant to *Teamsters Local 177 v. United Parcel Service*, 966 F.3d 245, 252 (3d Cir. 2020), a District Court "'must grant [a confirmation] order' unless the arbitration award is 'vacated, modified or corrected.'" Further, because the Arbitration Award at issue in this case has been attached by LVHP, together with the parties' CBA, as part of its Complaint, it is entirely appropriate for this Court under the essence test standard of review to make a determination as to whether the Award draws its essence from the CBA at the pleadings stage, *see PG Publ'g*, 19 F.4th at 314 ("It may well be the case that many LMRA Section 301 actions to vacate can be decided as a matter of law on the pleadings."). LVHP is incorrect in its assertion that it must "be given a reasonable opportunity to present all material relevant to a summary judgment motion" before the Court can rule on the pending motions. *See PG Publ'g*, 19 F.4th at 314 ("'As this matter seeks review of a labor arbitration award, there are no material issues of fact presented, but rather questions as to which party is entitled to a judgment as a matter of law.'")(quoting *Prospect CCMC, LLC v. CCNA/Pa. Ass'n of Staff Nurses and Allied Pros.*, 2019 WL 342713, at *8 (E.D. Pa. 2019)).

and Motion to Vacate as Exhibits A and B respectively, LVHP is incorrect in suggesting that a determination of the validity of the Arbitration Award requires the taking of evidence for the filing of motions for summary judgment. This is so because, as has been well-established, courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them." *Misco,* 484 U.S. at 38. Indeed, the Supreme Court has made clear that "[t]he courts are not authorized to reconsider the merits of an award even though the parties may allege that the award *rests on errors of fact or on misinterpretation of the contract." Id.* at 36 (emphasis added).

LVHP, in arguing that the arbitration award does not draw its essence from the CBA, recognizes the limited and highly deferential review accorded to a labor arbitrator's award. Thus, it concedes that "[a]n arbitration award must be enforced as long as the arbitrator arguably construes or applied the contact, even if the arbitrator has committed a serious error." (Doc. 10, at 23; *see also id.* at 24 (LVHP recognizing that "[a]n arbitration award 'draws its essence' from a CBA if the arbitrator's interpretation 'can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention[s].'") (quoting *Brentwood Med. Assocs. v. UMW,* 396 F.3d 237, 240 (3d Cir. 2005)). Notwithstanding its recognition of the standard of review applicable here,

LVHP argues that Article 8.4 is not ambiguous and that the arbitrator erred in finding otherwise.

Plaintiff quotes *Bohler-Uddeholm America, Inc. v. Ellwood Group., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001), for the proposition that "a contract will be found ambiguous if, and only if, it is reasonably susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." (Doc. 10, at 25). Yet that is precisely the basis on which the arbitrator found Article 8.4 to be ambiguous. Arbitrator Verrone considered the parties' arguments as to the meaning of Article 8.4 of the agreement and found the language ambiguous, writing:

> Considering the foregoing, I am of the opinion that the evidence thus far adduced, establishes that the disputed language is susceptible to more than one plausible interpretation rather than a single clear and unambiguous conclusion and is, therefore, debatable. The question, therefore, presented is how the disputed ambiguous language shall be resolved.

(Doc. 1-2, at 24). The Arbitrator then discussed the evidence presented stating:

> As the record reflects that the disputed language has existed in the current Agreement and in predecessor agreements for many years, the only evidence of any change to its terms occurred during the most recent negotiations where it is undisputed that the notification periods had been shortened. Notwithstanding, no testimony was elicited to what extent there may have been any discussion as to its substantive meaning or application, if any, during negotiations. As such, I am left to conclude that neither party intended any change to their perceived understandings of its meaning or application. Likewise, the absence of evidence of any prior settlements between the parties as to Article 8.4, fails to assist the arbiter in resolving its meaning.

(*Id*. at 24-25).

Thus, here again, LVHP's argument presents a disagreement with the bargained for interpretation of the Arbitrator as to the meaning of Section 8.4. This Court finds no error in the Arbitrator's interpretation of Section 8.4. However, even were this Court to have harbored such a view, the decisions by the Supreme Court in *Misco* and *Garvey* foreclose such a view from serving as a basis to vacate the award. As stated in *Garvey*:

> We recently reiterated that if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced that he committed serious error does not suffice to overturn his decision.

532 U.S. at 509 (internal quotation marks omitted).

LVHP also asserts that the award does not draw its essence from the CBA because the arbitrator used past practice "in coming to his decision." (Doc.10, at 28).

The Arbitrator determined that Section 8.4 was ambiguous and that consideration of the Union's grievance rested on the meaning of that Article. He offered that a "more deliberate reading, . . . particularly with regard to the somewhat awkward language used in the clause the 'current shift hours of employees'" suggested to him that "to adopt the Hospital's interpretation, the clause simply needed to provide the clear and unambiguous words the 'current shifts of employees.'" (Doc. 1-2, at 24). He noted the Union's argument that reference to "current starting time of employees" referred to "the overall starting time of a particular unit or shift of 'employees', but not to that of an individual employee." (*Id*.). On this basis, the Arbitrator found that the disputed language was "susceptible to more than one plausible interpretation rather than a single clear and unambiguous conclusion and is,

therefore, debatable." (*Id.*).  The Arbitrator thus referred to evidence of the parties' past practice under Article 8.4, observing that "[o]ne of the most important standards used by arbitrators in the interpretation of ambiguous language is that of the relevant custom or past practice of the parties." (*Id.* at 25).

The Arbitrator's use of past practice to ascertain the meaning of Article 8.4 and resolve the ambiguity which he found therein was entirely appropriate and in accordance with the case law in this Circuit.  Particularly instructive is *Ackers National Roll Company v. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*, 712 F.3d 155 (3d Cir. 2013).  In that case, the Union submitted three grievances on behalf of an employee, Nelson Lubik, alleging that the company had violated a past practice by failing to schedule Lubik, a maintenance clerk, for some Saturday overtime when the maintenance department was scheduled to work.  The arbitrator sustained the Union's three grievances and ordered the company to pay Lubik back wages for the missed overtime.  The company sued to vacate the arbitrator's award. The District Court vacated the award, finding that the award did not draw its essence from the CBA because the "plain language of the CBA 'unambiguously' gave the Company the exclusive right to schedule its workforce." *Akers*, 712 F.3d at 156-157.  On appeal, the Circuit Court reversed the District Court's judgment and ordered enforcement of the arbitrator's award.  The Union, at the arbitration, had argued that a past practice had been established based on the employee having worked weekend shifts along with the

40

maintenance department employees even on weekends when he had not been formally

scheduled to work and that, in those instances, he had been paid overtime for that week.

The company argued that based on the "zipper clause" in the CBA as well as the CBA's

Management Rights Clause, which included the right to schedule the work force, the

grievances should be denied since the past practice had never been reduced to writing.

The arbitrator founded his analysis on whether a past practice had in fact been established

and whether the zipper clause of Section 2 of the CBA prohibited a finding of past practice.

*Id.* at 159.  The arbitrator concluded that a "binding past practice" had been established

when the employee was permitted to work on weekends even though his name did not

appear on the work schedule.  *Id*.

Although the District Court vacated the arbitrator's award, granting the company's

cross-motion for summary judgment, the Third Circuit reversed.  First, the Circuit set forth

the essence test standard of review, citing *Misco, Inc*., *supra* and *Enterprise Wheel & Car

Corp*., *supra*, of the *Steelworkers Trilogy*.  It elaborated:

> As this Court stated 44 years ago:
>
> > [A] labor arbitrator's award does draw its essence from the
> > collective bargaining agreement if the interpretation can in any
> > rational way be derived from the agreement, viewed in the light of
> > its language, its context, and any other indicia of the parties'
> > intention.
>
> *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969)
> (internal quotation marks omitted).

41

*Akers*, 712 F.3d at 160.  Then, the Court addressed the question of the validity of the use of

extrinsic evidence of past practice:

> This raises a critical threshold issue for our consideration: was the CBA so
> unambiguous as to the Company's right to schedule its workforce such that the
> Arbitrator's award, in which he inquired into past practice, manifestly
> disregarded the CBA? This Court has stated that "extrinsic evidence of 'past
> practice' could be admitted, if at all, only to resolve an ambiguity in the CBA."
> *Quick v. N.L.R.B.*, 245 F.3d 231, 247-248 (3d Cir.2001). In support of this
> statement, *Quick* cited to *U.A.W. Local 1697 v. Skinner Engine Co.*, 188 F.3d
> 130 (3d Cir.1999), which, quoting an opinion of the U.S. Court of Appeals for
> the Seventh Circuit, stated:
>
> > Although extrinsic evidence is admissible to show that a written
> > contract which looks clear is actually ambiguous, perhaps because
> > the parties were using words in a special sense, ... there must be
> > either contractual language on which to hang the label of
> > ambiguous or some yawning void ... that cries out for an implied
> > term. Extrinsic evidence should not be used to add terms to a
> > contract that is plausibly complete without them.
>
> *Id*. at 146 (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th
> Cir.1993) (en banc)).

*Id.* at 161-162.

After reviewing the relevant provisions of the CBA, including the Management Rights

Clause and the section of the CBA entitled "Hours of Work" the Circuit Court concluded that:

> the CBA was not so free of ambiguity regarding the Company's exclusive right
> to schedule its workforce such that the Arbitrator's inquiry into past practice and
> introduction of extrinsic evidence were not permissible. Our inquiry, however,
> does not end there. We still must determine whether the award draws its
> essence from the CBA.

*Id*. at 163.  The Court then found that the award did draw its essence from the CBA, stating:

A half century past, this Court made clear in *Ludwig Honold* that an award draws its essence from the CBA if it can be derived from the Agreement in any rational way, and that a reviewing court may disturb only those awards demonstrating a manifest disregard of the Agreement. 405 F.2d at 1128. In view of the previous discussion of ambiguities in the CBA's language, and applying the teachings of *Ludwig Honold*, we conclude here that the Arbitrator's interpretation draws its essence from the CBA, and that the Arbitrator did not manifestly disregard the CBA. Accordingly, the District Court should not have disturbed the award.

*Id.* at 165.

In the present case, there is "contractual language on which to hang the label of ambiguous" as the Arbitrator found in Section 8.4 of the CBA. The Arbitrator was called upon to review the provisions of the CBA and apply them to determine the validity of the grievance. In doing so, he found Section 8.4 to be ambiguous in that it was susceptible to more than one meaning on its face. He therefore appropriately resorted to the parties' practice throughout their collective bargaining relationship and found that

> [b]ased upon the foregoing, it appears that the longstanding and undisturbed practice of the parties with respect to nurses' hours of work over the past 25 to 30 years was that nurses were assigned to specified shifts with or without flex to another shift and that any changes made were as a result of a nurse's willingness to accept another position which may or may not have had a different shift requirement.

(Doc. 1-2, at 26). He further found that the "work schedules of those employees which have consisted of single shift positions has been engrained in the parties' scheduling practices for at least the past 25 years and, as such, may be considered a benefit of personal value to employees." (*Id.* at 27).

The use of practices and the "law of the shop" were recently reaffirmed in

*Independent Laboratory Employees' Union, Inc. v. ExxonMobil Research and Engineering*

*Company*, 11 F.4th 210 (3d Cir. 2021).  There, the Circuit Court affirmed an Arbitrator's

decision which prevented the employer from contracting out bargaining unit laboratory

positions.  The employer moved to vacate and the Union sought confirmation.  The Court of

Appeals held that the Arbitrator's decision drew its essence from the CBA and affirmed the

District Court.

In *Independent Laboratory Employees' Union*, the Union's grievance arose when a

bargaining unit member in the position of materials coordinator retired.  The employer

contracted with independent contractors to staff the position.  The Union grieved,

challenging the propriety of the contracting out of bargaining unit positions in this way.  It

was undisputed in the case that the employer was permitted to hire independent contractors

under the CBA.  Yet the Union nonetheless claimed that the employer was not merely hiring

an independent contractor but rather was attempting to permanently fill bargaining unit

positions with contractors thereby undermining the Union through attrition of Union

members.  The employer argued that its practice of contracting out work was consistent with

the CBA and that any impact on the bargaining unit was irrelevant to whether the CBA had

been violated.  The Arbitrator considered the impact on the bargaining unit in determining

the validity of the grievances, which the employer argues was improper and beyond the

scope and terms of the CBA.  *Id*. at 212.

The Circuit Court's analysis of the case began with the Recognition Clause set forth in Article 1, Section 2. *Id.* at 213. It also noted the provision of the CBA that permitted independent contractors to perform work customarily performed by employees subject to the proviso that the company "may not because of lack of work demote or lay off any employee(s) qualified to perform the contracted work." *Id.* The Arbitrator took into consideration a prior statement by the employer's Vice President in 1977 that the company did not have at that time, and would not have in the future, "any intent to erode the bargaining unit nor limit the number of bargainable employees." *Id.* at 214. In addition, the Arbitrator took note of the prior Arbitration Awards on the issue of the use of independent contractors. *Id.* at 214-215. The Arbitrator ultimately sustained the Union's grievance, finding that the permanent contracting out undermined the "composition and breadth of the bargaining unit, and by doing so, is not authorized by the CBA." *Id.* at 215. The Circuit Court, in upholding the District Court's affirmance of the Arbitration Award, stated that its inquiry as to whether the Arbitration Award draws its essence from the CBA:

> is not circumscribed by a rigid and mechanical examination of the text of the CBA. Long-established labor law does not allow us to take the view that "an employee's claim must fail unless he [or she] can point to a specific contract provision upon which the claim is founded." Our narrow scope of review arises from the recognition of the realities of the relationship between labor and management. Too many unforeseeable contingencies may arise in an industrial setting for us to mechanically reject an arbitrator's interpretation of a collective bargaining agreement. Such agreements are often comprehensive resolutions of competing interests within the complex environment of a workplace that often has competing economic, managerial, and interpersonal dynamics.

The Supreme Court recognized the need to achieve a workable balance in such an environment in deciding *United Steelworkers v. Warrior & Gulf Navigation Co.* There, the Court described the "common law of the shop." Unlike other contractual relationships, the relationship between an employer and a labor union entering a labor agreement is unique because a relationship almost always exists between the employer and the union before the parties enter negotiations. "Law of the shop" is a gap filler that necessarily arises from the impossibility of creating a CBA sufficient to regulate every aspect of the relationship between an employer and a union. Moreover, arbitration plays its own role in developing the "law of the shop" since "[t]he processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the [CBA]." Thus, an arbitrator must be able to look to the practices of the industry and the shop—including past arbitration agreements and company statements—in addition to a CBA in adjudicating a labor dispute. Accordingly, we uphold arbitration awards as long as "they are not in 'manifest disregard of the law' and can be rationally derived from the permissible sources of law."

11 F.4th at 216. The Circuit Court emphasized that the practices of the industry and the shop, the industrial common law, is equally a part of the CBA, stating:

This Court and the Supreme Court have repeatedly explained that "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the [CBA] although not expressed in it." Thus, it was not only appropriate, it was necessary, for Arbitrator Klein to also consider the overall relationship between the Union and the Company and their unique history as part of the "law of the shop," as long as doing so did not violate an unambiguous contrary provision of the CBA. This award was not a clear violation of the restrictions and rights bargained for in the CBA.

*Id.* at 217.

The Arbitration Award at issue in the present case, in that Arbitrator Verrone resorted to the use of past practice to clarify the ambiguous language of Article 8.4, presents an application of the use of "past practice and law of the shop" as explained in *Independent*

*Laboratory Employees' Union.*  At bottom, the Arbitrator looked to the evidence presented to

him at the arbitration hearing and determined that a past practice existed which gave

meaning to Section 8.4 and, in doing so, demonstrated that "the longstanding and

undisturbed practice of the parties with respect to nurses' hours of work over the past 25 to

30 years was that nurses were assigned to specified shifts with or without flex to another

shift and that any changes made were as a result of a nurse's willingness to accept another

position which may or may not have had a different shift requirement."  (Doc. 1-2 at 26).

The Arbitrator found that this practice clarified the meaning of Article 8.4 and found that

Article 8.4 "does not . . . permit the Hospital to change the 'current position' of an employee

which specifies the applicable shift or shifts associated with that position."  (*Id*. at 27).  The

Arbitrator found that the Hospital was attempting to expand the "position" of the bargaining

unit nurses so as to "be available to work multiple shifts rather than those shifts under which

employment was offered and accepted" and that the single shift positions "has been

engrained in the parties' scheduling practices for at least the past 25 years . . ." (*Id*.).  This

is precisely the type of reasoning which the Circuit Court approved of in *Independent*

*Laboratory Employees Union, supra*.

Finally, LVHP asserts that the award must be vacated because the remedy issued

by the Arbitrator and his retention of jurisdiction with respect to the implementation of the

remedy fails to draw its essence from the Collective Bargaining Agreement.  Here, LVHP

asserts that the Arbitrator ordered it to reinstate employees who voluntarily resigned from

their employment.  (Doc. 10, at 32).  That statement is inaccurate as to what the Arbitration Award provides.  The Arbitrator did not order the reinstatement of employees who voluntarily resigned but instead he retained jurisdiction as to "any further dispute between the parties as to the application of the remedial provisions ordered [in the Opinion and Award]", (Doc. 1-2, at 30).

Here, the parties expressly stipulated at the arbitration proceeding that the Arbitrator was to determine the remedy in the event he sustained the Union's grievance.  (Doc. 1-2, at 1).  In determining the appropriate remedy, the Arbitrator required that any nurse who was issued the letters dated January 17, 2022, be provided with written notice that, to be considered for reinstatement, such individual must respond to the Hospital in writing not later than 30 days from the date of LVHP's letter informing them of their eligibility for reinstatement to their former position without loss of seniority or benefits, but without back pay, if the resignation was due "in substantial part" to the violation of Section 8.4 to the CBA by LVHP.  The Arbitrator left to the parties "the details of the eligibility and/or integration of any nurse deemed eligible for reinstatement to their former position of employment".  (*Id.* at 30).  As noted in *Misco* "where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect."  484 U.S. at 38.  In any event, although the Arbitrator adjudicated the issue of the appropriate remedy for LVHP's contract violation, he left the specific application of that remedy to the individual nurses to be resolved by LVHP and the Union.

Only in the circumstance where the parties are unable to resolve the application of the prescribed remedy has the Arbitrator retained jurisdiction to resolve such dispute. Thus, Arbitrator Verrone's retention of jurisdiction for this purpose is proper.

Finally, the Court notes that under the Third Circuit's decision in *PG Publishing*, the arbitrator's retention of jurisdiction for the limited purpose of resolving any disputes as to the implementation of the remedy granted does not constitute a failure to adjudicate all issues submitted by the parties to the arbitrator and that therefore the award was final. *See PG Publ'g*, 19 F.4th at 323 ("we hold that an arbitration award is final if it 'evidences the arbitrators' intention to resolve all claims submitted in the demand for arbitration,' and it 'resolve[s] them definitively enough so that the rights and obligations of the two parties, with respect to the issues submitted, do not stand in need of further adjudication.'")(internal citations omitted). In *PG Publishing*, similar to the award in the present action, the award under review was held to be final, notwithstanding the arbitrator reserving jurisdiction only "for the limited purpose of resolving any disputes that may arise in the implementation of the remedy granted ... herein." *Id*. at 323.[6]

---

[6] LVHP also asserts that the Award must be vacated where the Arbitrator's decision to retain jurisdiction violates public policy, arguing that the Arbitrator is retaining "for himself indefinite jurisdiction to decide disputes of LVHP's hiring process" (Doc. 10, at 32-34).

A court may refuse to enforce a collective bargaining agreement, as well as an arbitration award issued pursuant to the CBA, when the CBA or the award issued pursuant to it violates public policy. *See W.R. Grace & Co. v. Rubber Workers* 461 U.S. 757, 766 (1983).

The [Supreme] Court has made clear that any such public policy must be "explicit," "well defined," and "dominant." [*W.R. Grace*, 461 U.S. at 766]. It must be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed

Because the Arbitration Award at issue draws its essence from the CBA in all aspects and for the further reason that the Arbitrator has properly retained jurisdiction to adjudicate the issue of the appropriate remedy, the Union's motion to dismiss LVHP's "Complaint and Motion to Vacate Arbitration Award" will be granted.

## VI. CONCLUSION

For the afore-stated reasons, the Union's Motion to Dismiss (Doc. 4) Plaintiff's "Complaint and Motion to Vacate Arbitration Award" will be granted.  A separate Order follows.

Robert D. Mariani
United States District Judge

---

public interests.'" [*W.R. Grace,* 461 U.S. at 766] (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)); accord, *Misco, supra,* at 43, 108 S.Ct. 364.

*E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17,* 531 U.S. 57, 62-63 (2000).  The Third Circuit has characterized the public policy exception as "slim indeed."  *Serv. Emps. Union Local 36 v. City Cleaning Co., Inc.,* 982 F.2d 89, 92 (3d Cir. 1992).
Here, LVHP is incorrect in its characterization of the Arbitrator's retention of jurisdiction as infringing on its rights to make hiring decisions.  The Arbitrator only reserved jurisdiction over disputes which may arise as to the eligibility for reinstatement of affected LVHP employees.  LVHP has failed to identify any public policy violated by the Arbitrator's remedy by reference to any "laws or legal precedents."  Thus, this Court finds no violation of well-defined public policy in the offer of reinstatement to eligible employees pursuant to the terms of a valid labor arbitration award.